**RHP BEARINGS LTD., NSK Bearings Europe Ltd., and NSK Corporation, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee,**

and

**The Torrington Company, Defendant–Appellee.**

No. 01–1160.

United States Court of Appeals, Federal Circuit.

April 30, 2002.

Matthew P. Jaffe, Lipstein, Jaffe & Lawson, LLP, of Washington, DC argued for plaintiffs-appellants. With him on the brief were Robert A. Lipstein and Grace W. Lawson.

Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant United States. With her on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief were John D. McInerney, Acting Chief Counsel; Berniece A. Browne, Senior Counsel; and David R. Mason, Attorney, Office of Chief Counsel for Import Administration, Department of Commerce, Washington, DC.

Geert De Prest, Stewart and Stewart, of Washington, DC, argued for defendant-appellee The Torrington Company. With him on the brief were Terence P. Stewart and Lane S. Hurewitz. Of counsel was Wesley K. Caine.

Before NEWMAN, SCHALL, and BRYSON, Circuit Judges.

SCHALL, Circuit Judge.

RHP Bearings Ltd. ("RHP Bearings"), NSK Bearings Europe Ltd. ("NSK Bearings"), and NSK Corporation (collectively, "RHP–NSK") appeal the final decision of the United States Court of International Trade that affirmed the final antidumping duty determination of the United States Department of Commerce, International Trade Administration ("Commerce"), in *Antifriction Bearings (Other Than Tapered Rolling Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews* ("*Final Results*"), 63 Fed.Reg. 33,320 (Dep't Commerce June 18, 1998). *RHP Bearings Ltd. v. United States*, 120 F.Supp.2d 1116 (Ct. Int'l Trade 2000). The Court of International Trade held that, in its determination of the antidumping duty to be applied to antifriction bearings imported into the United States by RHP–NSK during the period covered by the *Final Results*, Commerce had not erred in computing (i) the constructed export price of the imported bearings, pursuant to 19 U.S.C. § 1677a (1999) [1], or (ii) the normal value of the bearings, pursuant to 19 U.S.C. § 1677b. *RHP Bearings*, 120 F.Supp.2d at 1131. Specifically, the court determined that Commerce did not err

---

1. Because the administrative review at issue was initiated after January 1, 1995, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub.L. No. 103–465, 108 Stat. 4809 (1994) (effective January 1, 1995). Therefore, unless otherwise indicated, statutory citations are to the 2000 version of the United States Code. No relevant amendments have been made to the pertinent statutory provisions since the URAA amendments.

when, in computing the constructed export price of the subject bearings, it declined to apply the special rule of 19 U.S.C. § 1677a(e), that comes into play in the circumstances where value is added to merchandise after importation. *RHP Bearings*, 120 F.Supp.2d at 1126. The court also held that, when using constructed value to determine the normal value of the subject bearings, *see* 19 U.S.C. § 1677b(e), Commerce did not err in computing the profit component of constructed value.[2] *RHP Bearings*, 120 F.Supp.2d at 1126–27.

We affirm the decision of the Court of International Trade sustaining Commerce's determination of constructed export price. We do so because we conclude that, under 19 U.S.C. § 1677a(e), Commerce had discretion as to whether to apply the special rule, and RHP does not, in the alternative, challenge Commerce's calculation as otherwise unreasonable or unsupported by substantial evidence. However, we vacate the court's decision sustaining Commerce's calculation of the profit component of constructed value and remand the case for further proceedings. That result is mandated by our recent decision in *SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed.Cir.2001). There, we vacated the decision of the Court of International Trade and remanded the case with the instruction that Commerce (i) explain its methodology for calculation of constructed value profit (identical to Commerce's constructed value profit calculation challenged in this appeal), and (ii) explain why that methodology comported with statutory requirements. We thus affirm-in-part, vacate-in-part, and remand.

***

**2.** The Court of International Trade resolved several other issues regarding adjustments to constructed export price and normal value; they are not before us on appeal.

# BACKGROUND

## I.

The antidumping law provides that if Commerce determines that imported merchandise is being sold in the United States "at less than its fair value" and the practice is causing material injury to a domestic industry, "there shall be imposed upon such merchandise an antidumping duty." 19 U.S.C. § 1673. The antidumping duty is "in an amount equal to the amount by which the normal value exceeds the export price ... for the merchandise." 19 U.S.C. § 1673. "Normal value" generally is the price at which the "subject merchandise"[3] is sold in the exporting country. *See* 19 U.S.C. § 1677b. "Export price" generally is the price at which the subject merchandise is first sold in the United States. *See* 19 U.S.C. § 1677a.

### A. *Determining Constructed Export Price.*

When a foreign producer or exporter sells a product to an affiliated purchaser in the United States, the antidumping law provides for the use of a "constructed export price" as the "export price" for purposes of computing the dumping margin (the difference between normal value and export price). *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1303 (Fed.Cir. 2001). Constructed export price is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States ... to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d) of [19 U.S.C. § 1677a]." 19 U.S.C. § 1677a(b).

***

**3.** "Subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation." 19 U.S.C. § 1677(25).

Under section 1677a(c), the price used to establish constructed export price is subject to specified increases and reductions. Further adjustments to constructed export price are set forth in section 1677a(d). Pursuant to 19 U.S.C. § 1677a(d)(2), "the price used to establish constructed export price shall also be reduced by ... the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e) of this section."

Subsection (e) of section 1677a sets forth a further method of calculating constructed export price when value is added to merchandise after importation:

**(e) Special rule for merchandise with value added after importation.**

Where the subject merchandise is imported by a person affiliated with the exporter or producer, and the value added in the United States by the affiliated person is likely to exceed substantially the value of the subject merchandise, the administering authority shall determine the constructed export price for such merchandise by using one of the following prices if there is a sufficient quantity of sales to provide a reasonable basis for comparison and the administering authority determines that the use of such sales is appropriate:

(1) The price of identical subject merchandise sold by the exporter or producer to an unaffiliated person.

(2) The price of other subject merchandise sold by the exporter or producer to an unaffiliated person.

If there is not a sufficient quantity of sales to provide a reasonable basis for comparison under paragraph (1) or (2), or the administering authority determines that neither of the prices described in such paragraphs is appropriate, then the constructed export price may be determined on any other reasonable basis.

19 U.S.C. § 1677a(e). While they both address the situation in which value is added to merchandise after importation, sections 1677a(d)(2) and 1677a(e) represent quite different approaches to calculating constructed export price. Section 1677a(d)(2) provides for the price used to calculate constructed export price being reduced by the cost of further processing. Section 1677a(e), on the other hand, provides for calculating constructed export price without reference to the price at which the further manufactured goods are sold to an unaffiliated purchaser.

B. *Determining Normal Value.*

■ As noted above, the antidumping duty for particular merchandise is the amount by which the merchandise's normal value exceeds its export price or, when applicable, its constructed export price. Typically, normal value is calculated within a reasonable time of the sale providing a basis for the export price. *See* 19 U.S.C. § 1677b(a)(1)(A). Normal value is "the price at which the foreign like product is first sold ... for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i). However, in circumstances where an insufficient quantity of sales has occurred in the exporting country, or the market in the exporting country does not otherwise provide a comparable price, Commerce may look to third country sales of the subject merchandise to determine normal value. *See* 19 U.S.C. §§ 1677b(a)(1)(C) and 1677b(a)(1)(B)(ii). The antidumping law provides that, in such circumstances, Commerce may utilize "the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States." 19 U.S.C. § 1677b(a)(1)(B)(ii).

In the alternative, section 1677b(a)(4) provides that where normal value cannot

be determined under section 1677b(a)(1)(B)(i), then, notwithstanding section 1677b(a)(1)(B)(ii), "the normal value of the subject merchandise may be the constructed value of that merchandise." Constructed value is calculated according to 19 U.S.C § 1677b(e), which provides in pertinent part as follows:

(e) Constructed value.

For purposes of this subtitle, the constructed value of imported merchandise shall be an amount equal to the sum of—

(1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise . . . ;

(2)(A) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(B) if actual data are not available with respect to the amounts described in subparagraph (A), then—

(i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii) the weighted average of the actual amounts incurred and realized [as described in part (i) ] by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses and for profits,

in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method . . . ; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States. . . .

19 U.S.C. § 1677b(e).

 As can be seen, constructed value is not the actual price at which subject merchandise is offered for sale in the exporting country. Rather, it is a "proxy" for a sales price, based on an amalgamation of component costs. *See SKF*, 263 F.3d at 1373. The statute provides four separate methods for calculating the general administrative costs and profit components of the constructed sum. 19 U.S.C. § 1677b(a)(e)(2). Actual data from the exporter's manufacture and sale of foreign like products in the exporting country is preferred. *See* 19 U.S.C. § 1677b(e)(2)(A) and (B). Only if such data is unavailable, as where there are no home-market sales of foreign like products, or only sales below-cost, is Commerce to utilize one of the remaining three methods, set forth in section 1677b(e)(2)(B). *SKF*, 263 F.3d at 1374 & n. 4. We turn now to the facts of this case.

## II.

This case concerns the eighth administrative review of the antidumping duty order on Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof, covering the period May 1, 1996,

through April 30, 1997. *RHP Bearings*, 120 F.Supp.2d at 1118.

RHP Bearings and NSK Bearings manufacture and sell bearings in the United Kingdom, some of which are sold to a United States affiliate, NSK Corporation. During the period covered by the review, both made sales to their U.S. affiliate. As part of the administrative review, Commerce sent RHP–NSK a questionnaire requesting information concerning the quantity of sales of the subject bearings, the home market, any relevant third-country markets, the U.S. market, costs of production, and constructed value.[4] This information was sought so that Commerce could calculate normal value.

Included in the questionnaire was a section A.8, entitled "Further Manufacture or Assembly in the United States." The section was directed to "subject merchandise exported to the United States and changed in value or physical condition ('further manufacture') prior to delivery to the first unaffiliated customer in the United States." The section requested that, for the period of review, the respondent provide the weighted-average net price charged to the affiliated importer for each product included in the review that was further manufactured, as well as the weighted-average net price charged to unaffiliated U.S. customers for each further manufactured final product. *RHP Bearings*, 120 F.Supp.2d at 1121. This information was sought to enable Commerce to determine whether the value added by further manufacture substantially exceeded the value of the subject merchandise that had been further processed. Commerce explained: "If you do not believe that the value-added in the United States exceeds substantially the value of the subject merchandise that has been further processed, you need not provide this information."

*See id.* RHP–NSK did not submit this data. *See id.*

The questionnaire also contained a Section E, entitled "Cost of Further Manufacture or Assembly Performed in the United States." This section requested information necessary for calculating constructed export price in the situation where it was not believed that the value added by further manufacture exceeded substantially the initial import value. Responding to Section E, RHP–NSK provided information relating to further manufacturing in the United States; this included information relating to raw materials, labor, electricity, and equipment. *See id.* at 1120–21. RHP–NSK furnished in addition an analysis of the costs of the above inputs, as well as a fairly thorough description of its accounting practices and financial methods. *See id.* at 1120. Commerce used the data provided by RHP–NSK in its questionnaire to calculate the constructed export price of the RHP–NSK bearings sold during the period of review. *See id.* at 1121.

Commerce published the preliminary results of the administrative review on February 9, 1998. *See* 63 Fed.Reg. 6512–03. In the preliminary results, Commerce stated that, except in the cases of RHP–NSK and one other manufacturer, it had employed the special rule for further manufactured goods in calculating constructed export price, *see* 19 U.S.C. § 1677a(e). 63 Fed.Reg. at 6,515. According to Commerce, this approach was consistent with Commerce's intention to apply the special rule in all cases where "the value added is likely to exceed substantially the value of the subject merchandise." *Id.* The information supplied by firms responding to Section A.8 of the questionnaire was used to determine whether this criterion was met. Com-

---

**4.** Throughout the review, Commerce treated the affiliated corporations as a single entity (collectively "RHP–NSK") for the purpose of determining antidumping duties.

merce determined that the threshold for use of the special rule would be crossed when value added during further manufacturing in the United States contributed to a minimum of 65% of the price charged to the first unaffiliated customer for the manufactured product. *Id.* In the case of RHP–NSK, Commerce calculated the constructed export price pursuant to 19 U.S.C. § 1677a(d)(2) by deducting costs of further manufacturing described in RHP–NSK's response to Section E of the questionnaire. *Id.* Commerce did not calculate the relative value of RHP–NSK's further manufacturing. However, RHP–NSK argues, and Commerce does not dispute, that the value of such further manufacturing exceeded Commerce's 65% threshold.

With respect to the normal value calculation, *see* 19 U.S.C. § 1677b, Commerce determined, based upon responses to its questionnaire, that RHP–NSK and several other exporting firms could not base normal value on home market sales in the manner contemplated by 19 U.S.C. § 1677b(a)(1)(B)(i). Commerce explained that a substantial portion of home market sales for RHP–NSK and the several other manufacturers had been determined to be below the cost of production and that, therefore, pricing data from home market sales would not be used in determining normal value. *Preliminary Results,* 63 Fed.Reg. at 6516. In arriving at this determination, Commerce relied upon data for all identical bearings, and bearings within the same family.[5] *Id.* Having determined that normal value could not be calculated under section 1677b(a)(1)(B)(i), Commerce turned to the constructed value methodology of 19 U.S.C. § 1677b(e). In arriving at the profit component to be used

in the constructed value calculation, Commerce utilized 19 U.S.C. § 1677b(e)(2)(A), which looks to profits in connection with the production and sale of a foreign like product. *Final Results,* 63 Fed.Reg. 33,-320 at 33,333. However, in that regard, Commerce did not employ the same definition of "foreign like product" that it had used in the price-based calculations that it had initially made under § 1677b(a)(1)(B)(i) (identical bearings and bearings within the same family). Rather, it referenced "all [anti-friction bearing] models within the order-specific subject merchandise that were reported in the foreign-market sales databases as potential matches to U.S. sales." *Id.* In other words, Commerce aggregated data for all foreign like products for all bearing families under review. *See RHP Bearings,* 120 F.Supp.2d at 1126.

In response to Commerce's *Preliminary Results,* RHP–NSK, along with other interested parties, provided comments. In its comments, RHP–NSK argued that, in its case, Commerce had erred in not using the special rule of 19 U.S.C. § 1677a(e) in computing constructed export price. *Final Results* at 33,338. RHP–NSK suggested that the value added by further processing to its exported bearings exceeded Commerce's 65% threshold and that the statute therefore required that Commerce use the special rule. *Id.* Commerce rejected this argument in the *Final Results,* stating that the decision to apply the special rule was discretionary. According to Commerce:

> the special rule for further manufacturing exists in order to reduce the Department's administrative burden.... [Sec-

**5.** Bearing "family" is defined in the *Preliminary Results:* "a bearing family consists of all bearings within a class or kind of merchandise that are the same in the following physical characteristics: load direction, bearing

design, number of rows of rolling elements, precision rating, dynamic load rating, outer diameter, inner diameter, and width." *Preliminary Results* at 6516.

tion 1677a(e)] of the Act [ ] provides that the Department need only apply the special rule where it determines that the use of such alternative calculation methodologies is appropriate. We retain the authority to refrain from applying the special rule in those situations where the value added, while large, is simple to calculate.

*Final Results* at 33,338.

Regarding Commerce's calculation of the profit component of constructed value for purposes of arriving at a normal value for the bearings under review, several interested exporters responded by criticizing Commerce's use of aggregated data from all families of bearings. Specifically, it was argued that giving "foreign like product" two different meanings when applying the provisions for determining normal value was improper and contrary to the definition of the term "foreign like product" in 19 U.S.C. § 1677(16). *Final Results* at 33,334.[6] In response, Commerce stated that

> an aggregate calculation that encompasses all foreign like products under consideration for normal value represents a reasonable interpretation of [19 U.S.C. § 1677b(e)(2)(A) ]. Moreover, we believe that, in applying the preferred method for computing CV profit under [19 U.S.C. § 1677b(e)(2)(A) ], the use of aggregate data results in a reasonable and practical measure of profit that we can apply consistently in each case.

*Id.* at 33,333.

Pursuant to 28 U.S.C. § 1581(c), RHP–NSK challenged Commerce's *Final Results* determinations before the Court of International Trade. The Torrington

Company intervened as a defendant in the litigation.

### III.

Upon the administrative record, the Court of International Trade, upheld Commerce's anti-dumping determinations in the *Final Results. RHP Bearings,* 120 F.Supp.2d 1116. The court agreed with the government that, under 19 U.S.C. § 1677a(e), Commerce had discretion in deciding whether to apply the special rule. *Id.* at 1125. In doing so, it relied on the language of section 1677a(e) which states that the special rule may be used "if . . . the administering authority determines that the use of such sales is appropriate." *Id.* The court concluded that Commerce had properly determined that the rule is inappropriate "in those situations where the value added, while large, is simple to calculate." *Id.* at 1126 (quoting *Final Results* at 33,338).

The Court of International Trade also upheld Commerce's use of all foreign like products under consideration for purposes of calculating the profit component of constructed value in determining normal value. *RHP Bearings,* 120 F.Supp.2d at 1126–27. The court relied upon a prior Court of International Trade decision, *RHP Bearings Ltd. v. United States,* 83 F.Supp.2d 1322 (Ct. Int'l Trade 1999). In that case, the court held that an identical method of calculating constructed value profit, which used aggregate data of all foreign like products under consideration in order to determine normal value under 19 U.S.C. § 1677b(e)(2)(A), was consistent with the antidumping statute. *RHP Bearings,* 120 F.Supp.2d at 1126.

---

**6.** As seen above, Commerce concluded that RHP–NSK's home market sales of foreign like product were below cost and therefore could not provide a basis for normal value. In reaching that conclusion, Commerce used data from sales of identical bearings and bearings within the same bearing family—a definition of foreign like product not followed in Commerce's later calculation of the constructed normal value.

RHP–NSK has timely appealed the Court of International Trade's determination on these two issues. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

### I.

■ "When reviewing anti-dumping determinations made by Commerce, this court applies anew the standard of review applied by the Court of International Trade in its review of the administrative record." *F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed.Cir.2000). We uphold Commerce's determination unless it is "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

On appeal, RHP–NSK renews its challenge to Commerce's determination of constructed export price and normal value. Specifically, RHP–NSK takes issue with Commerce's determination to adjust the price used to arrive at constructed export price by reducing that price by the cost of further manufacture or assembly, as contemplated by 19 U.S.C. § 1677a(d)(2). According to RHP–NSK, Commerce should have followed the approach of the special rule set forth in 19 U.S.C. § 1677a(e). As seen above, that section provides that, in specified circumstances, constructed export price is to be constructed from analogous sales of subject merchandise. RHP–NSK contends that the specified circumstances existed in this case. As far as normal value is concerned, RHP–NSK challenges Commerce's determination to calculate the profit component of constructed value under 19 U.S.C. § 1677b(d)(2)(A) using "aggregate data" from reported home market sales of anti-friction bearings.

RHP–NSK's contentions implicate two issues of statutory interpretation. The first is whether section 1677a(e), the "Special Rule for Merchandise With Value Added After Importation," particularly mandates its use to calculate constructed export price in circumstances where the value added by additional manufacture substantially exceeds that of the subject merchandise. The second issue of statutory interpretation concerns Commerce's treatment of the term "foreign like product" as used in section 1677b(e)(2)(A) to calculate constructed value profit.

### II.

■ We review questions of statutory interpretation without deference. *U.S. Steel Group v. United States*, 225 F.3d 1284, 1286 (Fed.Cir.2000). In reviewing an agency's construction of the statute that it administers, we address two questions as required by the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The first question is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If so, we and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If, however, Congress has not spoken directly on the issue, we address the second question of whether the agency responsible for filling a gap in the statute has rendered an interpretation that "is based on a permissible construction of the statute." *Id.; see also Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1308 (Fed.Cir.2001).

### III.

A. *The Special Rule Issue.*

■ RHP–NSK argues that a reading of 19 U.S.C. §§ 1677a(d)(2) and (e) compels the conclusion that Commerce must apply the special rule whenever "the value

added in the United States by the affiliated person is likely to exceed substantially the value of the subject merchandise." 19 U.S.C. § 1677a(e). In making this argument, RHP–NSK points to section 1677a(d)(2), which states that the price used to establish constructed export price shall be reduced by "the cost of any further manufacture or assembly (including additional material and labor), *except* in circumstances described in subsection (e) of this section." (emphasis added). According to RHP–NSK, the word "except" is an unambiguous expression of the intent of Congress that section 1677a(d)(2) is not to apply in the circumstances described in subsection (e). RHP–NSK also argues that a reading of section 1677a(e) makes clear that application of the special rule is mandatory once it has been determined that the value of the imported product is substantially outweighed by the value added by further manufacturing in the United States. RHP–NSK bases this on the inclusion of the word "shall" in the statute:

> Where the subject merchandise is imported by a person affiliated with the exporter or producer, and the value added in the United States by the affiliated person is likely to exceed substantially the value of the subject merchandise, the administering authority *shall* determine the constructed export price for such merchandise by using one of the following prices . . . .

19 U.S.C. § 1677a(e) (emphasis added).

The government and Torrington respond that the statute confers broad discretion upon Commerce to determine whether to apply the special rule. Both parties argue that RHP–NSK ignores the parts of the statute quoted below. They contend that these provisions support the proposition that Commerce has discretion in selecting a methodology for the calculation of constructed export price:

> [T]he administering authority shall determine the constructed export price for such merchandise by using one of the following prices *if* there is a sufficient quantity of sales to provide a reasonable basis for comparison *and the administering authority determines that the use of such sales is appropriate:*
>
> (1) The price of identical subject merchandise sold by the exporter or producer to an unaffiliated person.
>
> (2) The price of other subject merchandise sold by the exporter or producer to an unaffiliated person.
>
> *If* there is not a sufficient quantity of sales to provide a reasonable basis for comparison under paragraph (1) or (2), *or the administering authority determines that neither of the prices described in such paragraphs is appropriate, then the constructed export price may be determined on any other reasonable basis.*

19 U.S.C. § 1677a(e) (emphasis added). According to the government and Torrington it is clear from the statutory language that application of the special rule is not mandatory, and is clearly subject to the discretion of Commerce.

The parties' contentions squarely frame the issue before us. The first part of 19 U.S.C. § 1677a(e) states the circumstances in which the special rule comes into play: "[w]here the subject merchandise is imported by a person affiliated with the exporter or producer, and the value added in the United States by the affiliated person is likely to exceed substantially the value of the subject merchandise." Neither Commerce nor Torrington alleges that such circumstances do not exist here. Therefore, the question we must answer is whether, when the triggering circumstances exist, section 1677a(e) requires Commerce to compute constructed export price using one of the two methodologies

set forth in section 1677a(e), or whether, when such circumstances exist, Commerce has discretion under the statute to calculate constructed export price in the manner provided in sections 1677a(c) and (d), which is what Commerce did in this case.

Turning to the first prong of the *Chevron* analysis, we conclude that Congress "has directly spoken to the precise question at issue" in this case: whether, when the triggering circumstances set forth in 19 U.S.C. § 1677a(e) are present, Commerce has discretion to apply or not to apply the special rule of section 1677a(e). Specifically, we conclude that Congress has directly expressed the intent to allow Commerce to determine, when the triggering circumstances of section 1677a(e) are present, whether application of the special rule is appropriate. Stated another way, Congress has directly expressed the intent to allow Commerce to exercise its discretion when faced with the circumstances described in section 1677a(e).

Turning to the statutory language, we note that even when the circumstances set forth in section 1677a(e) are present, the prices in sections 1677a(e)(1) and (2) are not used for constructed export price unless two further conditions are met: (1) there is a "sufficient quantity" of sales of the kind described in subsections (1) and (2) "to provide a reasonable basis for comparison" and (2) Commerce "determines that the use of such sales is appropriate." 19 U.S.C. § 1677a(e). At the same time, the final section of section 1677a(e) states that if Commerce determines that neither of the prices described in paragraphs (1) or (2) of subsection (e) is appropriate, "then the constructed export price may be

determined on any other reasonable basis." *Id.* We do not think that the language of the statute could present a clearer grant of discretion to Commerce.

The legislative history also evidences the intent of Congress to make the application of the special rule discretionary. It explains that the chief purpose of Congress in creating the special rule was to ease administrative burden. According to the "Statement of Administrative Action" ("SAA") from the URAA, HR Doc. No. 316,103 Cong., 2d Sess. (1994), Vol. 1:

New section [1677a](e) establishes a simpler and more effective method for determining export price in situations were an affiliated importer adds value to subject merchandise after importation. For example, if roller chain subject to an antidumping order is imported by an affiliated importer for incorporation into a motorcycle which then is sold to an independent party, there would be an enormous burden on Commerce if it were required to "back out" from the price of the motorcycle all of the value added in the United States to work back to the constructed export price of the roller chain.... *To avoid imposing an unnecessary burden on Commerce, section [1677a](e) authorizes Commerce to determine export price based on alternative methods....*

*SAA,* HR Doc. No. 316, at 825–26 (emphasis added).[7] It is clear from this passage that Congress did not intend for the special rule to dictate to Commerce a particular method for calculating constructed export price. Rather, the special rule was

---

**7.** The importance of the SAA in interpreting the URAA enactments is made clear in 19 U.S.C. § 3512(d), which states that "[t]he statement of administrative action approved by the Congress under section 3511(a) of this title shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." *See also Micron Tech.,* 243 F.3d at 1309.

meant to simplify what was considered a rather complicated analysis by offering alternatives. The statutory language and the SAA compel the conclusion that the special rule is, as Commerce has asserted, a discretionary provision.

Having concluded that section 1677a(e) gives Commerce discretion in determining whether the special rule should be applied, our *Chevron* inquiry is at an end. The next question we might expect to address is whether Commerce acted reasonably in exercising that discretion. *See AK Steel Corp. v. United States,* 192 F.3d 1367, 1371 (Fed.Cir.1999) ("[O]ur analysis is not whether we agree with Commerce's conclusions, nor whether we would have come to the same conclusions reviewing the evidence in the first instance, but only whether Commerce's determinations were reasonable."); *United States Steel Group v. United States,* 96 F.3d 1352, 1357 (Fed.Cir. 1996) ("Thus, the question in this case is not whether we agree with the Commission's decision, nor whether we would have reached the same result as the Commission had the matter come before us for decision in the first instance. By statute, Congress has allocated to the Commission the task of making these complex determinations. Ours is only to review those decisions for reasonableness."). In this case, however, RHP–NSK relies solely on its argument that, whenever the triggering circumstances are present, section 1677a(e) mandates application of the special rule. RHP–NSK does not argue that, assuming Commerce has discretion, it nevertheless acted unreasonably in this case. Accordingly, as far as the special rule is concerned, the only thing left for us to do is affirm the conclusion of the Court of International Trade.

B. *Calculation of Normal Value.*

 As seen above, Commerce resorted to a constructed value methodology in determining normal value for purposes of its analysis in the eighth administrative review. *See* 19 U.S.C. § 1677b(a)(4). RHP–NSK contends that, in that context, Commerce's use of aggregate data for *all* foreign like products to calculate the profit component of constructed value was contrary to 19 U.S.C. § 1677b(e)(2)(A), which refers only to "sale of *a* foreign like product." In the alternative, RHP–NSK argues that Commerce's use of aggregate data for "foreign like product" in section 1677b(e)(2)(A) conflicts with Congress's definition of the term in 19 U.S.C. § 1677(16). It asserts that because Congress created a hierarchy of preferred definitions for "foreign like product" in section 1677(16), Commerce is required to use a consistent definition throughout its application of the antidumping provisions. In other words, if Commerce determines that it can make a satisfactory determination as to "foreign like product" for the purpose of calculating normal value based upon the first definition of the term, *see* 19 U.S.C. § 1677(16)(A), then Commerce should apply that definition throughout the normal value calculation. However, as discussed above, in going through the process of calculating normal value, Commerce used the definition "identical bearings and bearings of the same family" for foreign like products as a basis for its price based calculation under 19 U.S.C. § 1677b(a)(1)(B)(i) and later abandoned this definition in favor of aggregate data for all foreign like products under consideration in its constructed value profit calculation under 19 U.S.C. § 1677b(e)(2)(A). RHP–NSK argues on appeal that this interpretation of sections 1677b(e)(2)(A) and 1677(16) was arbitrary and capricious.

The same issue was presented recently in *SKF USA Inc. v. United States,* 263 F.3d 1369 (Fed.Cir.2001). In *SKF,* another bearing manufacturer who was subject to Commerce's eighth administrative review raised the identical issue that is pre-

sented here—whether the term "foreign like product" should be applied consistently for the price-based calculation of normal value under 19 U.S.C. § 1677b(a)(1)(b)(i) and the calculation of the profit component of constructed value as a substitute for normal value under 19 U.S.C. § 1677b(e)(2)(A). *Id.* at 1376. We stated that where Congress had used the term "foreign like product" in several sections throughout the antidumping act, and specifically defined the term in 19 U.S.C. § 1677(16), we would presume that Congress intended that the term have the same meaning in each reference. *Id.* at 1382. In *SKF*, as in this case, Commerce argued that resort to the aggregate data definition of "foreign like product" in section 1677(16) was reasonable in the context of a constructed value profit calculation under § 1677b(e) even though it had not used that definition in calculating normal value under § 1677b(a)(1)(B)(i). We noted, however, that Commerce had not explained its justification for inconsistent use of the term in its analysis. We held that "[w]ithout an explanation sufficient to rebut th[e] presumption [that terms are meant to be used consistently throughout a statute], Commerce cannot give the term "foreign like product" a different definition (at least in the same proceeding) when making the price determination and in making the constructed value determination." *Id.*

We therefore concluded that Commerce's actions were arbitrary, relying on the decision of the District of Columbia Circuit in *Transactive Corp. v. United States*, 91 F.3d 232, 237 (1996), for the proposition that "an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." *See SKF*, 263 F.3d at 1382. We vacated the decision of the Court of International Trade that had sustained Commerce's determination and remanded the case for Commerce to explain its use of

multiple foreign like products in its calculations. *Id* at 1382. In light of our decision in *SKF*, we vacate the judgment of the Court of International Trade with respect to Commerce's constructed value profit calculations and remand for further proceedings on that issue.

## CONCLUSION

For the foregoing reasons, the decision of the Court of International Trade is *AF-FIRMED–IN–PART*, *VACATED–IN–PART*, and *REMANDED*.

## COSTS

Each party shall bear its own costs.